**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **GEORGE MCKINNEY on behalf of himself and all others similarly situated,** | : | **Case No. 10-CV-224** |
| | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **JUDGE KATHLEEN M. O'MALLEY** |
| **v.** | : | |
| **BAYER CORPORATION, et al.** | : | <u>**MEMORANDUM & ORDER**</u> |
| **Defendants.** | : | |

Before the Court is Defendants' Motion to Dismiss Plaintiff's Complaint. (Doc. 6.)  This Motion has been fully briefed and is ripe for adjudication.  For the reasons set forth below, Defendants' Motion to Dismiss is <u>**GRANTED in part and DENIED in part**</u>.  The Motion is granted as to the class claim under the Ohio Consumer Sales Practice Act, O.R.C. § 1345.01, *et seq.* ("OCSPA"), and as to Count IV. The Court denies the Motion as to Counts II, III, and as to McKinney's individual claim under the OCSPA, but will certify to the Ohio Supreme Court the question of whether a consumer has standing under the Ohio Deceptive Trade Practices Act, O.R.C. § 4165.01, *et seq.*

I.      <u>**BACKGROUND**</u>

    A.      **Factual Background[1]**

Defendants Bayer Corporation and Bayer Healthcare, LLC (collectively referred to as "Bayer") produce, market, and sell the "One-A-Day" line of vitamins, including the two products at issue in this case: One-A-Day Men's Health Formula and One-A-Day Men's 50+ Advantage

---

[1]Unless otherwise noted, the following facts are derived from Plaintiff's Complaint.

vitamin products (referred to collectively as the "Vitamin Products").  According to Plaintiff George
McKinney ("McKinney"), Bayer falsely advertises that the Vitamin Products "promote prostate
health" and "may reduce the risk of prostate cancer" ("the Prostate Claims").  To the contrary,
McKinney alleges, one of the key ingredients in the Vitamin Products, which Bayer claims provides
these health benefits – selenium – "actually poses serious health risks when taken in the amounts
recommended by Bayer."  (Doc. 1 at ¶¶ 1-2.)[2]

McKinney alleges that "Bayer does not possess a single proper scientific or clinical study"
supporting the Prostate Claims.  (*Id*. at ¶ 4.)  He then cites to scientific studies to support his claims
that selenium may, in some specific instances, actually *increase* the risk of aggressive prostate
cancer.  (*Id*. at ¶¶ 36-54.)  In addition, McKinney points to studies suggesting that selenium may
increase the risk of diabetes.  (*Id*. at ¶¶ 38-39.)

McKinney contends that Bayer's statements regarding the prostate health benefits of the
Vitamin Products "were widely disseminated" and appeared on package labels, on its website, and
in its commercial advertisements.  (*Id*. at ¶¶ 2, 25.)  With respect to the product packaging,
McKinney points to language on the front label of One-A-Day Men's Health Formula which states
that it "Supports Prostate Health," and the back label which provides, in part, that "emerging
research suggests Selenium may reduce the risk of prostate cancer."  (*Id*. at ¶¶ 27-28.)  The back of

---

[2]The Court takes judicial notice that a similar case involving the Vitamin Products is
pending in the Southern District of California.  *See Johns v. Bayer Corp*., Case No. 09CV1935
DMS (JMA).  In that case, as here, the plaintiffs argue that "Defendants promoted the health
benefits of selenium, but that selenium does not in fact prevent or reduce the risk of prostate
cancer and may actually be harmful."  *Johns v. Bayer Corp*., No. 09CV1935 DMS (JMA), 2010
U.S. Dist. LEXIS 62804, *2 (S.D. Cal. June 24, 2010).  In that case, the plaintiffs filed a putative
class action alleging claims for violation of California's Unfair Competition Law, Cal. Bus. &
Prof. Code § 17200, *et seq*. and the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et
seq*.  *Id*. at *3.  That court recently denied Bayer's motion to dismiss plaintiffs' second amended
complaint.  *Id*. at *2.

the package further states that:

> One A Day Men's Health Formula is a complete multivitamin plus key nutrients including Selenium to support a healthy prostate.* Selenium may reduce the risk of certain cancers.  Some scientific evidence suggests that consumption of Selenium may reduce the risk of certain forms of cancer. However, FDA has determined that this evidence is limited and not conclusive.
>
> *This statement has not been evaluated by the Food and Drug Administration.  This product is not intended to diagnose, treat, cure, or prevent any disease.

(Doc. 1 at ¶ 28; Doc. 7 at 11-12; Doc. 9-1 at 1.)  Similarly, the back of the product packaging for One-A-Day Men's 50+ Advantage states that it contains "nearly twice the Selenium in Centrum Silver to support prostate health." (Doc. 1 at ¶ 29.)

With respect to commercial advertisements, McKinney alleges that, since 2008, "Bayer has run at least eleven versions of television advertisements and at least nine versions of radio advertisements repeating the same misrepresentations."  (*Id*. at ¶ 25.)  Specifically, McKinney alleges, and Bayer does not dispute, that Bayer ran the following television and radio commercials advertising the Vitamin Products:

> **Radio Advertisement:**
> "Prostate cancer. It's an important subject. Did you know that there are more new cases of prostate cancer each year than any other cancer? And here's something else you should know. Now, there's something you can do that may help reduce your risk. Along with your regular doctor checkups, switch to One A Day Men's. A complete multivitamin plus selenium, which emerging research suggests may help reduce the risk of prostate cancer. One A Day Men's. Because staying healthy is serious business."
>
> **Television Advertisement:**
> "Did you know one in three men will face prostate issues? One in three, really? That's why One A Day Men's is a complete multivitamin with selenium which emerging research suggests can help prostate health. One A Day Men's."
>
> **Television Advertisement:**
> "To stay on top of my game after 50, I switched to a complete multivitamin with more. Only One A Day Men's 50+ Advantage has gingko for memory and

3

concentration plus support for prostate and heart health. Safe. That' s a great call. One A Day Men's."

(Doc. 1 at ¶¶ 30-32.)  Finally, McKinney points to Bayer's website, which repeats the Prostate Claims: "Did you know that 1 in 6 men will face prostate issues? Prostate cancer is the most frequently diagnosed non-skin cancer in men, and emerging research suggests Selenium may reduce the risk of prostate cancer." (*Id.* at ¶ 33.)

McKinney alleges that he saw and heard Bayer's television and radio commercial advertisements and purchased both Vitamin Products in reliance on the Prostate Claims contained therein. (*Id.* at ¶¶ 34, 78.)  The Complaint does not specify which of the advertisements McKinney allegedly saw or relied upon in making his purchases.  Nor does it contain any allegations regarding when he purchased the products, the purchase price, or whether McKinney actually consumed the Vitamin Products at issue.  McKinney does not allege that he suffered any physical harm from ingesting the Vitamin Products.

### B.    Procedural History

On February 2, 2010, McKinney filed a putative class action against Bayer alleging that its advertisements for the Vitamin Products, including the product packaging, "are unlawful, unfair, fraudulent, and unconscionable," because they falsely claim that the Vitamin Products promote prostate health and reduce the risk of prostate cancer.  (Doc. 1 at ¶¶ 1-3.)  Specifically, McKinney's Complaint asserts the following four (4) claims for relief stemming from Bayer's promotion, advertisement, and labeling of the Vitamin Products: (1) violation of the Ohio Consumer Sales Practice Act, O.R.C. § 1345, *et seq.* ("OCSPA"); (2) violation of the Ohio Deceptive Trade Practices Act, O.R.C. § 4165, *et seq.* ("ODTPA"); (3) breach of express warranty; and (4) breach of implied warranty.

4

McKinney seeks to bring a class action on behalf of "[a]ll persons who purchased the Vitamin Products in Ohio.  Excluded from the Class are Defendant's officers, directors and employees and those who purchased the products for the purpose of resale." (*Id*. at ¶ 63.) McKinney claims that he and the other class members were damaged because they: (1) purchased Vitamin Products "that were falsely advertised;" (2) "did not receive the Vitamin Product[s] as advertised and warranted and containing the claimed health benefits;" and (3) now face "an increased risk of serious health problems." (*Id*. at ¶¶ 1, 24, 109.)

On February 25, 2010, Bayer filed a Motion to Dismiss Plaintiff's Complaint (Doc. 6).[3] McKinney filed an Opposition to the Motion to Dismiss (Doc. 21), and Bayer filed a Reply in Support (Doc. 22).  McKinney sought and obtained leave to file a Sur-reply in Opposition to the Motion to Dismiss (Doc. 23) to address the Supreme Court's decision in *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 130 S.Ct. 1431, 176 L.Ed.2d 311 (2010), which was decided on March 31, 2010.  Bayer subsequently provided two notices of supplemental authority relevant to the Court's resolution of the Motion to Dismiss, and McKinney has filed responses.  (Docs. 27-30.)

## II.  **STANDARDS OF REVIEW**

Bayer brings its Motion to Dismiss pursuant to Rules 12(b)(6) and 12(b)(1) of the Federal Rules of Civil Procedure.

### A.  **Standard of Review Under Rule 12(b)(6)**

The Court may dismiss a claim for failure to state a claim upon which relief can be granted

---

[3]Bayer filed a separate Motion to Strike Allegations in Plaintiff's Complaint (Doc. 10). On July 12, 2010, the Court granted Bayer's Motion to Strike and ordered Paragraph 56 of the Complaint stricken.  (Doc. 26.)  Bayer also filed a Motion to Extend Class Certification Motion and Briefing Deadlines pending resolution of this Motion (Doc. 18), which the Court granted as unopposed.

under Federal Rule of Civil Procedure12(b)(6).  The purpose of a motion under 12(b)(6) is to test the sufficiency of the complaint – not to decide the merits of the case.

It is well-established that a complaint need not set forth in detail all of the particularities of the plaintiff's claim.  *See Myers v. Delaware Co.*, No. 2:07-cv-844, 2009 U.S. Dist. LEXIS 98143, *6 (S.D. Ohio Oct. 22, 2009).  Instead, Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief."  Rule 8 does not, however, "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009).  While legal conclusions can provide the framework for a complaint, all claims must be supported by factual allegations.  *Id*.  The Supreme Court has indicated that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id*. at 1949; *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)("[A] formulaic recitation of the elements of a cause of action" is insufficient).

To withstand a motion to dismiss pursuant to Rule 12(b)(6), a complaint must plead facts sufficient "to state a claim for relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  The requisite facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949. The plausibility requirement is not the same as a "probability requirement" but instead "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*.  Therefore, where a complaint pleads facts that are "merely consistent with" the defendant's liability, "its stops short of the line between possibility and plausibility of entitlement to relief." *Id*. (citing *Twombly*, 550 U.S. at 557).  Examining whether a complaint states a plausible claim for relief is a "context-specific

6

task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950.

A district court considering a motion to dismiss must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded allegations in the complaint as true. *See Grindstaff v. Green*, 133 F.3d 416, 421 (6th Cir. 1998); *Iqbal*, 129 S.Ct. at 1950 ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."). Where the well-pleaded facts "do not permit the court to infer more than the mere possibility of misconduct," the complaint fails to state a claim. *Iqbal*, 129 S.Ct. at 1950. In sum, the allegations in the complaint must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

In ruling on a motion to dismiss, a court may consider: (1) any documents attached to, incorporated by, or referred to in the pleadings; (2) documents attached to the motion to dismiss that are referred to in the complaint and are central to the plaintiff's allegations, even if not explicitly incorporated by reference; (3) public records; and (4) matters of which the court may take judicial notice. *Whittiker v. Deutsche Bank Nat'l Trust Co.*, 605 F.Supp.2d 914, 924-25 (N.D. Ohio 2009). Judicial notice is proper as to facts "not subject to reasonable dispute" because they are either: (1) "generally known within the territorial jurisdiction of the trial court;" or (2) "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

Here, Bayer requests that the Court take judicial notice of the product packaging for both of the Vitamin Products "because the packaging referenced in Plaintiff's Complaint is illegible and incomplete." (Doc. 8 at 1-2.) McKinney has neither objected to these documents, nor challenged

7

their authenticity. *See Wright v. General Mills, Inc.*, No. 09CV1532 L(NLS), 2009 U.S. Dist. LEXIS 90576, *13 (S.D. Cal. Sept. 30, 2009) (taking judicial notice "of various labels and packaging items" associated with the products because neither party contested the authenticity of the documents, and they served as the basis for the plaintiff's allegations). Because the packaging of the Vitamin Products is central to McKinney's allegations, Bayer's Request for Judicial Notice (Doc. 8) is **GRANTED**.

### B.     Standard of Review Under Rule 12(b)(1)

Although Bayer primarily seeks dismissal of McKinney's Complaint under Rule 12(b)(6), it also requests dismissal of McKinney's individual OCSPA claim under Rule 12(b)(1) for lack of jurisdiction.

Where subject matter jurisdiction is challenged in a Rule 12(b)(1) motion, the plaintiff bears the burden of proving jurisdiction. *Moir v. Greater Cleveland Regional Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990). Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction fall into two general categories: facial attacks and factual attacks. Fed. R. Civ. P. 12(b)(1); *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994).

A facial attack challenges the sufficiency of the pleading itself. Where the Rule 12(b)(1) motion presents a facial attack, the Court accepts the material allegations in the complaint as true and construes them in the light most favorable to the nonmoving party, similar to the standard for a Rule 12(b)(6) motion. *Id.* (citing *Scheuer v. Rhodes*, 416 U.S. 232, 235-37 (1974)).

In contrast, a factual attack is "not a challenge to the sufficiency of the pleading's allegation, but a challenge to the factual existence of subject matter jurisdiction." *Id*. Where the motion presents a factual attack, the allegations in the complaint are not afforded a presumption of

8

truthfulness and the Court weighs the evidence to determine whether subject matter jurisdiction exists.  On a factual attack, the Court has broad discretion to consider extrinsic evidence, including affidavits and documents, and can conduct a limited evidentiary hearing if necessary.  *See DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004); *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990).

### III.  **DISCUSSION**

Bayer seeks dismissal of McKinney's Complaint in its entirety.  First, Bayer argues that McKinney's class claim under the OCSPA fails as a matter of law because his allegations do not satisfy the requirements of O.R.C. § 1345.09(B), and that the Court lacks jurisdiction over his individual OCSPA claim (Count I).  Second, Bayer contends that McKinney's claim for breach of express warranty (Count III) fails because the challenged statements were not affirmations of fact.  Third, Bayer argues that McKinney's ODTPA claim (Count II) fails because consumers cannot file suit under the statute.  Fourth, Bayer alleges that McKinney's breach of implied warranty claim (Count IV) must be dismissed because he has not alleged facts to show privity.  Finally, Bayer claims that both of McKinney's breach of warranty claims fail for the additional reason that he has not identified a cognizable injury and he seeks damages that are not available.

The Court considers each of the claims in McKinney's Complaint in turn.  For the reasons articulated below, the Court finds that dismissal pursuant to Rule 12(b)(6) is proper as to the OCSPA class claim asserted in Count I and as to Count IV (breach of implied warranty).  With respect to McKinney's ODTPA claim on behalf of himself and the Class Members (Count II), Bayer's Motion is denied. The Court believes there is sufficient uncertainty as to whether a consumer has standing under the statute, and therefore finds it appropriate to certify the issue to the Ohio Supreme Court.

As to McKinney's breach of express warranty claim on behalf of himself and the Class (Count III),

Bayer's motion is denied.  Finally, Bayer's request for dismissal of McKinney's individual OCSPA

claim for lack of subject matter jurisdiction under Rule 12(b)(1) is also denied.

### A.      Ohio Consumer Sales Practice Act (Count I)

In Count I of the Complaint, McKinney alleges that Bayer's unsubstantiated claims regarding

prostate health-related benefits of the Vitamin Products violate the OCSPA.  The OCSPA prohibits

suppliers from committing either unfair or deceptive consumer sales practices or unconscionable acts

or practices as set forth in O.R.C. § 1345.02 and § 1345.03.  In general, the OCSPA "defines 'unfair

or deceptive consumer sales practices' as those that mislead consumers about the nature of the

product they are receiving, while 'unconscionable acts or practices' relate to a supplier manipulating

a consumer's understanding of the nature of the transaction at issue."  *Whitaker v. M.T. Automotive,*

*Inc.*, 855 N.E.2d 825, 829 (Ohio 2006) (internal citations omitted).

The OCSPA permits both individual and class action claims.  *See* O.R.C. § 1345.09; *see also*

*City of Findlay v. Hotels.com*, 441 F.Supp.2d 855, 862 (N.D. Ohio 2006).  Under § 1345.09(A), "[a]

consumer may, in an individual action, rescind the transaction or recover damages for a violation of

the CSPA."  *Marrone v. Phillip Morris USA, Inc.*, 850 N.E.2d 31, 33 (Ohio 2006).  A consumer can

assert a class action claim under the OSCPA "only if the defendant's alleged violation of the Act is

substantially similar to an act or practice previously declared to be deceptive by one of the methods

identified in" O.R.C. § 1345.09(B).  *Id.*

Under O.R.C. § 1345.09(B), a consumer "may qualify for a class action only when a supplier

acted in the face of prior notice that its conduct was deceptive or unconscionable."  *Id.* at 34.  The

requisite notice must be in the form of: (1) a rule adopted by the Ohio Attorney General; or (2) a

judicial decision involving substantially similar conduct. *Id*. at 33-34. It is well-established that "[l]ack of prior notice requires dismissal of class action allegations." *St. Clair v. Kroger Co.*, 581 F.Supp.2d 896, 901 (N.D. Ohio 2008) (citing *Bower v. Int'l Business Machines, Inc.*, 495 F.Supp.2d 837, 841 (S.D. Ohio 2007)); *see also City of Findlay*, 441 F.Supp.2d at 863 (finding that "the City cannot bring an OCSPA class action claim because the two prerequisites set forth in Ohio Rev. Code § 1345.09(B) have not been alleged"); *Volbers-Klarich v. Middletown Management, Inc.*, 929 N.E.2d 424, 441 (Ohio 2010) (holding "that appellant's claim seeking certification of a class action alleging a violation of the OCSPA fails to state a claim upon which relief can be granted" because the complaint did not "satisfy the notice requirement of R.C. 1345.09(B)").

Bayer argues that McKinney cannot maintain his OCSPA claim as a class action because he has not satisfied the heightened pleading requirements set forth in O.R.C. § 1345.09(B). Specifically, Bayer argues that McKinney fails to allege that Bayer's conduct was previously declared deceptive or unconscionable in an administrative rule or judicial decision. In response, McKinney alleges that: (1) he can assert a class action under O.R.C. § 1345.09(A) without meeting the requirements set forth in § 1345.09(B); and (2) even if § 1345.09(A) contains a prohibition against class actions, the prohibition conflicts with Rule 23 of the Federal Rules of Civil Procedure and is therefore preempted by Rule 23. According to McKinney, he can assert a class action under either (A) or (B) of the statute.

The parties agree that the Supreme Court's March 31, 2010 decision in *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 130 S.Ct. 1431, 176 L.Ed.2d 311 (2010), controls the issue of whether McKinney's OSCPA claim can be asserted as a class action. Bayer argues that "the heightened pleading requirements of the OCSPA are not preempted under the *Shady Grove* analysis

11

because they do not conflict with Federal Rule 23 and because they are interwoven with the substantive remedies available under the OCSPA." (Doc. 29 at 2.)  In contrast, McKinney argues that, under *Shady Grove*, "Rule 23 permits all class actions that meet its requirements," and therefore "state limitations that would impair a federal court's ability to join claims under Rule 23 are preempted." (Doc. 25-1 at 2.)  According to McKinney, after the *Shady Grove* decision, a "federal court sitting in diversity cannot prohibit class maintenance of [§ 1345.09(A)] claims under Rule 23." (*Id*. at 2, n.2.)

### 1.      *Shady Grove v. Allstate*

In *Shady Grove*, the Supreme Court addressed a New York law, N.Y. Civ. Prac. Law Ann. § 901(b), which, "in suits seeking penalties or statutory minimum damages . . . precludes a federal district court sitting in diversity from entertaining a class action under Federal Rule of Civil Procedure 23." *Shady Grove*, 130 S.Ct. at 1436.  The plaintiff in *Shady Grove* filed a putative class action to recover unpaid statutory interest.  *Id*.  The district court dismissed the suit for lack of jurisdiction on grounds that statutory interest is a penalty under New York law and that § 901(b) therefore prohibited the proposed class action.  *Id*. at 1437.  The United States Court of Appeals for the Second Circuit affirmed, finding that: (1) Rule 23 and § 901(b) did not conflict; and (2) § 901(b) was "substantive" and must be applied by federal courts sitting in diversity.  *Id*.

In a 5-4 decision, the Supreme Court reversed.  Justice Scalia, who delivered the opinion of the Court with respect to Parts I and II-A, held that "§ 901(b) does not preclude a federal district court sitting in diversity from entertaining a class action under Rule 23."  *Id*. at 1433.  The majority of the Court agreed that a two-step process applied to its analysis.  First, the court must determine "whether Rule 23 answers the question in dispute."  *Id*. at 1437.  If it does, then Rule 23 applies

"unless it exceeds statutory authorization or Congress's rulemaking power." *Id*.

Applying this framework, the Court first found that Rule 23 answers the question at issue: whether Shady Grove's suit could proceed as a class action. *Id*. The Court noted that Rule 23 "creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action." *Id*. The Court found that Rule 23 and § 901(b) were in conflict because Rule 23 "provides a one-size-fits-all formula for deciding the class-action question," and § 901(b) "attempts to answer the same question – *i.e.*, it states that Shady Grove's suit 'may *not* be maintained as a class action' . . . because of the relief it seeks." *Id*. (emphasis in original). "Rule 23 permits all class actions that meet its requirements, and a State cannot limit that permission by structuring one part of its statute to track Rule 23 and enacting another part that imposes additional requirements." *Id*. at 1439. The Court concluded that a conflicting state class action provision could apply in a diversity suit only if "Rule 23 is ultra vires," or outside the scope of the Rules Enabling Act, 28 U.S.C. § 2071, *et seq*. *Id*. at 1437.

In Part II-B of the opinion, Justice Scalia, writing on behalf of himself and three other Justices, found that a Rule of Federal Procedure is within the Rules Enabling Act as long as it regulates procedure only. *Shady Grove*, 130 S.Ct. at 1442. He noted that, if the Rule "governs only the manner and the means by which the litigants' rights are enforced, it is valid; if it alters the rules of decision by which [the] court will adjudicate [those] rights, it is not." *Id*.(internal citations and quotations omitted). Applying this criteria, Justice Scalia concluded that Rule 23 is within the Rules Enabling Act because it is procedural in nature: it "merely enables a federal court to adjudicate claims of multiple parties at once, instead of in separate suits" and "it leaves the parties' legal rights and duties intact and the rules of decision unchanged." *Id*. at 1443. Justice Scalia further noted that

13

"the substantive nature of New York's law, or its substantive purpose, *makes no difference*." *Id*. at 1444 (emphasis in original).  Instead, it is the "the substantive or procedural nature of the Federal Rule" that matters.  *Id*.  Where a Federal Rule regulates procedure, it is authorized by the Rules Enabling Act, "and is valid in all jurisdictions, with respect to all claims, regardless of its incidental effect upon state-created rights."  *Id*.

Although Justice Stevens joined Parts I and II-A of Justice Scalia's opinion and agreed, under the first step of the framework, that Rule 23 and § 901(b) conflict, he wrote a separate concurrence with respect to the second part of the analysis: whether application of Rule 23 violates the Rules Enabling Act.  *See Bearden v. Honeywell Int'l Inc.*, No. 3:09-1035, 2010 U.S. Dist. LEXIS 83996, *25-26 (M.D. Tenn. Aug. 16, 2010) (noting that the majority fractured with respect to the Rules Enabling Act and "[e]ffectively, there was a 4-1-4 split in the opinions").

In his concurrence, Justice Stevens states that "an application of a federal rule that effectively abridges, enlarges, or modifies a state-created right or remedy violates" the Rules Enabling Act. *Shady Grove*, 130 S.Ct. at 1451.  According to Justice Stevens, "not every federal rule of practice or procedure . . . will displace state law."  *Id*. at 1449.  To the contrary, under Justice Stevens' approach, the issue of whether a state law can be displaced by a federal rule "turns on whether the state law is actually part of a State's framework of substantive rights or remedies."  *Id*.  The difficulty is that a state procedural rule "though undeniably procedural in the ordinary sense of the term, may exist to influence substantive outcomes . . . and may in some instances become so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy."  *Id*. at 1450 (citations omitted).

Justice Stevens held that a federal rule "cannot govern a particular case in which the rule

14

would displace a state law that is procedural in the ordinary use of the term but is so intertwined with a state right or remedy that it functions to define the scope of the state-created right." *Id*. at 1452. With respect to the New York law at issue, Justice Stevens concluded that it was "hard to see how § 901(b) could be understood as a rule that, though procedural in form, serves the function of defining New York's rights or remedies." *Id*. at 1457. Because the New York law limiting class actions did not create substantive rights or remedies, Justice Stevens agreed that Rule 23 controlled the class certification issue. *Id*. at 1459-60.

Although they took different paths to get there, Justice Scalia and Justice Stevens ultimately reached the same conclusion: application of Rule 23 to the facts presented in *Shady Grove* did not violate the Rules Enabling Act. As a result, although the Court found that Rule 23 falls within statutory authorization, there is no majority opinion explaining why, and the Court has "not set forth a single test for whether a Federal Rule is procedural and thus consonant with the Rules Enabling Act." *See Retained Realty, Inc. v. McCabe*, Nos. 08-5259-cv(L), 09-2377-cv(CON), 09-3186-cv(CON), 2010 U.S. App. LEXIS 9212, 6 n.1 (2d Cir. May 5, 2010).

### 2.      Relevant Case Law Interpreting the *Shady Grove* Decision

In a recent decision here in the Northern District of Ohio, Judge James Gwin considered whether, in light of the Supreme Court's decision in *Shady Grove*, a federal court sitting in diversity should apply the class action limitations set forth in O.R.C. § 1345.09(B). *See In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, No. 1:08-WP-65000, 2010 U.S. Dist. LEXIS 69254, *6-8 (N.D. Ohio July 12, 2010). In *Whirlpool*, the plaintiffs alleged that "because O.R.C. § 1345.09(B) conflicts with Rule 23 here – *i.e.*, it implicitly prohibits the plaintiffs from maintaining their OCSPA claim as a class action because Whirlpool's conduct was not previously declared to be deceptive –

15

it cannot apply in this diversity action unless Rule 23 is ultra vires." *Id*. at *5-6 (citing *Shady Grove*, 130 S.Ct. at 1437). The court noted that Rule 23 is never ultra vires under Justice Scalia's plurality approach "because, looking solely at the federal rule, it really regulate[s] procedure." *Id*. at *6 (citing *Shady Grove*, 130 S.Ct. at 1442-43) (internal quotations omitted). In contrast, the court found that Rule 23 is ultra vires vis-a-vis O.R.C. § 1345.09 under Justice Stevens' approach "because it would 'abridge, enlarge, or modify [Ohio's] rights or remedies, and thereby violate the [Rules] Enabling Act.'" *Id*. (quoting *Shady Grove*, 130 S.Ct. at 1457).

Judge Gwin explained that "O.R.C. § 1345.09 purports to define Ohio's substantive rights and remedies by creating a cause of action for defrauded consumers and declaring the relief available to them." *Id*. at *6-7. Applying Justice Stevens' concurrence, Judge Gwin found that the "class action restriction in O.R.C. § 1345.09(B) is intimately interwoven with the substantive remedies available under the OCSPA." *Id*. at *7 (citing *Shady Grove*, 130 S.Ct. at 1456). The court continued by distinguishing the New York law at issue in *Shady Grove* from O.R.C. § 1345.09(B) on grounds that the Ohio statute "is not a pan-substantive rule that applies to federal claims based on other states' laws," and, instead, applies only to claimed violations of the OCSPA. *Id*. As such, the court concluded, O.R.C. § 1345.09(B) is substantive in nature. *Id*. Because applying Rule 23 "would 'abridge, enlarge, or modify [Ohio's] rights or remedies,'" the court concluded that "it is ultra vires under the Rules Enabling Act, 28 U.S.C. § 2072(b), and must give way to O.R.C. § 1345.09(B)." *Id*. at *8.

In an analogous decision from the Middle District of Tennessee, the court similarly treated Justice Stevens' concurrence in *Shady Grove* as the controlling opinion. *See Bearden*, 2010 U.S. Dist. LEXIS 83996, at *29-30. In *Bearden*, the court considered Tenn. Code Ann. § 47-18-

16

109(a)(1), which provides that "[a]ny person who suffers an ascertainable loss . . . , as a result of . . . an unfair or deceptive act or practice declared to be unlawful by this part, may bring an action individually to recover actual damages." *Id*. at *23.  The Tennessee Supreme Court held that the statutory language "does not authorize a plaintiff to bring a class-action TCPA claim." *Id*. at 24. (internal citation omitted).  Despite this language, the plaintiff in *Bearden* alleged that *Shady Grove* "compels this court to allow the class-action TCPA claim to go forward." *Id*.

Applying Justice Stevens' approach, the court in *Bearden* found that the class action limitation was "so intertwined with th[e] statute's rights and remedies that it functions to define the scope of the substantive rights." *Id*. at *30.  Unlike the New York law at issue in *Shady Grove*, the class action limitation "is contained in the substantive rule itself, not in a separate procedural rule." *Id*.  In addition, the Tennessee statute specifically permits only those claims that are brought "individually." *Id*.  The court noted that this limitation reflected a policy decision "that the proper remedy for a violation affecting a class of consumers is prosecution by the Attorney General or by the Tennessee Department of Commerce and Insurance – not a private class action." *Id*.  Because the class action limitation "is a part of Tennessee's framework of substantive rights and remedies," the court found that Rule 23 did not apply. *Id*.

### 3.    Application of *Shady Grove* to McKinney's Class Claim Under the OCSPA.

McKinney claims that, after *Shady Grove*, he can assert a class action under either O.R.C. § 1345.09(A) or (B) because the statutory prerequisites contained in § 1345.09(B) are preempted by Rule 23.  (Doc. 25-1 at 6.)  McKinney attempts to distinguish *Whirlpool* and *Bearden* on two primary grounds.  First, he argues that the *Whirlpool* and *Bearden* courts incorrectly assumed that Justice Stevens' concurring opinion in *Shady Grove* controls.  (Doc. 30 at 1-2.)  Second, McKinney

17

attempts to distinguish *Whirlpool* on grounds that it dealt with a class claim under O.R.C. § 1345.09(B), while McKinney "intentionally limited his CSPA claim to a claim for damages or rescission under R.C. § 1345.09(A) and disclaimed any right to recover treble or statutory damages under division (B)." (*Id.* at 2.) The Court finds that McKinney's arguments are not well-taken.

### a. The Court Will Apply Justice Stevens' Concurrence.

As was the case in *Whirlpool* and *Bearden*, the Court finds that Justice Stevens' concurrence in *Shady Grove* is the controlling opinion by which it is bound. *See Whirlpool*, 2010 U.S. Dist. LEXIS 69254, at *6-8 (stating that Justice Stevens was "the crucial fifth vote in *Shady Grove*" and applying his approach); *see Bearden*, 2010 U.S. Dist. LEXIS 83996, at *29 ("Justice Stevens's concurrence is the controlling opinion"). The Court agrees that this approach is the most consistent with the Supreme Court's "narrowest grounds" rule, which instructs that: "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977); *United States v. Cundiff*, 555 F.3d 200, 208 (6th Cir. 2009) (quoting *Marks*).

In *Cundiff*, the Sixth Circuit stated that the "narrowest opinion refers to the one which relies on the least doctrinally far-reaching-common ground among the Justices in the majority: it is the concurring opinion that offers the least change to the law." *Cundiff*, 555 F.3d at 209 (internal citations and quotations omitted). Because Justice Stevens' concurring opinion would permit some state law provisions addressing class actions –whereas Justice Scalia's opinion in Part II-B (which only had the support of four Justices) would broadly prohibit any state law that conflicted with Rule 23 – Justice Stevens' opinion is the narrowest and, thus, controlling opinion.

18

        **b.**     **O.R.C. § 1345.09 is Substantive in Nature and is Not Preempted by Rule 23.**

McKinney next argues that, even if the Court applies Justice Stevens' concurring opinion, Rule 23 should control because there are no allegations that O.R.C. § 1345.09(A)'s "apparent class action prohibition" is intertwined with a state substantive right.  (Doc. 30 at 7-8.)  Although McKinney argues that he can maintain a class action under § 1345.09(A), in his supplemental briefing, he concedes that "[i]f division (A) contains a class action prohibition, it must be implied from the use of the phrase, 'individual action.'" (Doc. 30 at 2.)  McKinney further contends that the *Whirlpool* decision does not apply here because it dealt with O.R.C. § 1345.09(B).  (*Id*. at 2.)

As previously indicated, under Ohio law it is clear that a plaintiff bringing a claim under the OCSPA as a class action must satisfy the requirements set forth in O.R.C. § 1345.09(B).  There "must be a substantial similarity between a defendant's alleged violation of the Act and an act or practice previously declared deceptive by either a rule promulgated by the Attorney General or a court decision that was publicly available when the alleged violation occurred." *Marrone*, 850 N.E.2d at 36.  McKinney provides no authority for his position that he can assert a class action claim under O.R.C. § 1345.09(A) – as opposed to § 1345.09(B) – and the Court has found none.  Under § 1345.09(A), a plaintiff "may, in an individual action," recover damages.  By its terms, therefore, § 1345.09(A) is limited to individual actions.  And, unlike § 1345.09(B), there is no language authorizing a class action, under any circumstances, in § 1345.09(A).

Apparently, McKinney believes that O.R.C. § 1345.09(A) and (B) can be read to provide two separate substantive rights; one which places no restrictions on class actions, and thus presumably would not conflict with Rule 23, and one that expressly authorizes a class action, but does so in only limited circumstances.  McKinney's reading of § 1345.09 is inconsistent with both basic rules of

statutory construction and with all Ohio case law interpreting the OCSPA.  It is illogical to read § 1345.09(A) to imply an *unlimited* right to pursue class actions when § 1345.09(B) expressly authorizes class actions subject to the limitations set forth therein.  The statutory provisions must be read in *pari materia*.  *See Erlenbaugh v. United States*, 409 U.S. 239, 244 (1972) (noting that "individual sections of a single statute should be construed together").  When they are, it is clear that they operate together to establish one statutory scheme – a scheme which allows individual actions even without prior notice to the supplier and which only authorizes class actions where the supplier has such notice.  *See Bower,* 495 F.Supp.2d at 840 (noting that "a consumer class action is authorized only when the alleged act or practice was declared to be deceptive or unconscionable prior to the transaction on which the claim is based"); *Beard v. Dominion Homes Fin. Servs., Inc*., No. 2:06-cv-137, 2007 U.S. Dist. LEXIS 71469, *26 (S.D. Ohio Sept. 26, 2007) ("A consumer may qualify for class-action certification only when the defendants' alleged violations of the OCSPA are substantially similar to an act or practice previously declared to be deceptive by one of the methods defined in O.R.C. § 1345.09(B)."); *Nessle v. Whirlpool Corp*, No. 1:07CV3009, 2008 U.S. Dist. LEXIS 56940, *8 (N.D. Ohio July 25, 2008) ("For class certification to be proper, Defendant must be on notice that the specific conduct at issue violated the OCSPA.").  Although it is true that *Whirlpool* addressed class actions in the context of O.R.C. § 1345.09(B), that is because it is the *only* vehicle through which a substantive right to assert class claims is authorized.

The Court agrees with the reasoning set forth in *Whirlpool,* and finds that the class action limitations in O.R.C. § 1345.09(B) – which it finds equally apply to subsection (A) – are substantive in nature.  Because application of Rule 23 would "abridge, enlarge, or modify" Ohio's rights and remedies by permitting class actions even when the requirements in § 1345.09 are not satisfied, it

20

is ultra vires under the Rules Enabling Act.  *See Whirlpool*, 2010 U.S. Dist. LEXIS 69254 at *7-8.
 Applying Justice Stevens' approach in *Shady Grove*, the Court finds that Rule 23 does not preempt
O.R.C. § 1345.09.  *See id.*  Accordingly, McKinney's class claim under the OCSPA is **DISMISSED**.

> **B.      Ohio Deceptive Trade Practices Act (Count II)**

Count II of McKinney's Complaint alleges violation of the Ohio Deceptive Trade Practices

Act, O.R.C. § 4165.01, *et seq.* ("ODTPA").[4]  The ODTPA "is substantially similar to the federal

Lanham Act, and it generally regulates trademarks, unfair competition, and false advertising."

*Dawson v. Blockbuster, Inc.*, 2006 Ohio 1240, 2006 Ohio App. LEXIS 1138, ¶ 23 (Ohio Ct. App.

Mar. 16, 2006).  The parties dispute whether individual consumers, as opposed to commercial

entities, have standing to file suit under the ODTPA.  Bayer argues that they do not and that

McKinney's ODTPA claim should be dismissed as a matter of law.[5]  In contrast, McKinney contends

that they do and that the ODTPA is not limited to commercial entities.

As the parties note, there is a split between courts in the Northern District of Ohio and the

Southern District of Ohio on the question of who can file suit under the ODTPA.  Some judges in

this district have held that a consumer cannot state a claim under the ODTPA because it only governs

conduct between commercial entities – not conduct between a commercial entity and a consumer.

_____

[4]Specifically, McKinney alleges that Bayer violated the ODTPA by: (1) using deceptive
representations in connection with goods; (2) causing "likelihood of confusion or
misunderstanding as to the source, sponsorship, approval, or certification of goods;"
(3) representing that the goods "have sponsorship, approval, characteristics, ingredients, uses,
benefits . . . that they do not have;" (4) representing that the goods "are of a particular standard,
quality, or grade and they are of another;" and (5) advertising the goods "with intent not to sell
them as advertised."  (Doc. 1 at ¶ 92.)

[5]Alternatively, Bayer argues that, if this Court disagrees with its reading of the ODTPA,
the Court should stay these proceedings and certify the question of the Act's reach to the Ohio
Supreme Court.  (Doc. 22 at 17.)

*See Glassner v. R.J. Reynolds Tobacco Co.*, No. 5:99 CV 0796, 1999 U.S. Dist. LEXIS 22637, *21 (N.D. Ohio June 29, 1999) (Dowd, J.) (holding that the ODTPA "governs conduct between commercial entities, not between a commercial entity and a consumer"); *Chamberlain v. American Tobacco Co.*, No. 1-96 CV 2005, 1999 U.S. Dist. LEXIS 22636, *60 (N.D. Ohio Nov. 19, 1999) (Gaughan, J.) (agreeing with *Glassner* and finding that "the plain language of the Act indicates that it applies between business or commercial entities"); *Thornton v. State Farm Mut. Auto Ins. Co., Inc.*, No. 1:06-cv-00018, 2006 U.S. Dist. LEXIS 83968, *51-52 (N.D. Ohio Nov. 17, 2006) (Gaughan, J.) (dismissing the plaintiff's ODTPA claim "on the basis that the statute only applies to disputes between commercial entities").

In contrast, McKinney cites to a case from the Southern District of Ohio in which Judge Walter Rice indicated that *Glassner* and *Chamberlain* are "of limited precedential value in deciding the intent of the Ohio State Legislature in enacting the [O]DTPA." *Bower v. Int'l Business Machines, Inc.*, 495 F.Supp.2d 837, 842 (S.D. Ohio 2004). In *Bower*, the court looked to the statutory language, which provides that a "person who is injured by a person who commits a deceptive trade practice . . . may commence a civil action to recover actual damages from the person who commits the deceptive trade practice." *Id*. at 843 (quoting O.R.C. § 4165.03(A)(2)). Under the ODTPA, a *person* is defined as "an individual, corporation, government, governmental subdivision or agency, business trust, estate, trust, partnership, unincorporated association, limited liability company, two or more of any of the foregoing having a joint common interest, or any other legal or commercial entity." O.R.C. § 4165.01(D). While in *Chamberlain*, the court apparently interpreted the phrase "or any other legal or commercial entity" to place a limitation on the types of entities included in the list, Judge Rice concluded that, because the plaintiffs are individuals, "and the statute

22

by its plain language places no limitation on the type of individuals who are considered to be a 'person' and may pursue a claim," the plaintiffs could maintain a cause of action based on alleged violation of the ODTPA.  *Id.* at 843-44.

As Bayer correctly notes, the highest court in Ohio has not yet addressed the issue of whether a consumer can pursue a claim under the ODTPA.  As such, this Court must attempt to predict what the Ohio Supreme Court would do if presented with this question.  *See Mazur v. Young*, 507 F.3d 1013, 1016-17 (6th Cir. 2007).   In doing so, the Court can consider, among other things, decisions from the Ohio Courts of Appeals.  *See id.* at 1017.

It is well-established that Ohio courts look to the federal Lanham Act when interpreting claims under the ODTPA.  *Dawson*, 2006 Ohio 1240, at ¶ 23 (quoting *Chandler & Assoc. v. Am.'s Healthcare Alliance,* 709 N.E.2d 190, 195 (Ohio Ct. App. 1997) ("When adjudicating claims arising under the Ohio Deceptive Trade Practices Act, Ohio courts shall apply the same analysis applicable to claims commenced under analogous federal law.")); *HER, Inc. v. RE/MAX First Choice, LLC,* 468 F.Supp.2d 964, 979 (S.D. Ohio 2007) ("[A]n analysis appropriate for a determination of liability under . . . the Lanham Act is also appropriate for determining liability under the [ODTPA].").  In *Dawson*, the court noted that consumers lack standing to sue under the Lanham Act because its purpose "is exclusively to protect the interest of a purely commercial class against unscrupulous commercial conduct."  2006 Ohio 1240 at ¶ 24.  The plaintiff in *Dawson* was neither a consumer (because he received the goods as gifts) nor a commercial entity.  *Id*. at ¶ 25.  Because the Lanham Act denies standing to consumers, and Ohio courts apply the same analysis applicable to the Lanham Act to ODTPA claims, the *Dawson* court upheld the lower court's dismissal of plaintiff's ODTPA claim for failure to state a claim.  *Id*. at  ¶¶ 23-25.

23

Bayer urges the Court to adopt the court's reasoning in *Dawson* and to find that a consumer lacks standing to file suit under the ODTPA.  (Doc. 22 at 15.)  Because the Ohio Supreme Court declined to review Dawson's discretionary appeal, Bayer argues that this Court should treat *Dawson* "as the proper predictor of how the Ohio Supreme Court would decide this issue."[6]  (Doc. 22 at 15.) In response, McKinney contends that: (1) the ODTPA differs from the Lanham Act because the Lanham Act "restricts who can pursue a claim to competitors of the defendant," while the ODTPA does not; and (2) as Judge Rice held in *Bower*, the plain language of the ODTPA provides that individuals have standing to sue under the Act.[7]  (Doc. 21 at 17-18.)  Initially, the Court agrees with Judge Rice that the statute, on its face, defines "person" to include an "individual" and contains "no limit on the type of individuals who can pursue a claim."  *See Bower*, 495 F.Supp.2d at 843.  Any such limits must arise from some other source.  The Court turns, therefore, to the parties' arguments regarding the Lanham Act and its relationship to the ODTPA.

The Lanham Act confers standing on "any person who believes that he or she is or is likely

---

[6]Notably, while the Ohio Supreme Court declined to accept Dawson's appeal for review, it did so with three dissents.  *See Dawson v. Blockbuster, Inc.*, 852 N.E.2d 190 (Ohio 2006) (Moyer, C.J., O'Connor, J., and Lanzinger, J., dissenting).

[7]McKinney cites, without discussion, two Ohio cases in support of his position that consumers can file suit under the ODTPA.  In the first, *Evans v. Cheek*, 584 N.E.2d 1236 (Ohio Ct. App. 1989), which dealt with violations of the OCSPA, the Odometer Rollback and Disclosure Act, and the ODTPA, the court did not specifically consider the ODTPA because the only assignment of error was directed to the admissibility of expert testimony on the issue of damages.  *Id*. at 1237-39.  In the second case, *Falasco v. Bishop Motors, Inc.*, No. 14637, 1990 Ohio App. LEXIS 4938 (Ohio Ct. App. Nov. 7, 1990), the court reversed summary judgment on the basis that: (1) the trial court erred by refusing to apply strict liability on the transferor of the motor vehicle in connection with the plaintiff's Ohio Rollback and Disclosure Act violation; and (2) the trial court incorrectly weighed the evidence regarding the conflicting odometer disclosure statements.  *Id*. at *6-8.  Neither court specifically addressed the ODTPA claims, let alone the issue of who has standing to file suit under the statute.

24

to be damaged." 15 U.S.C. § 1125(a)(1)(B). The Act specifically defines the word "person" to include "a juristic person as well as a natural person." 15 U.S.C. § 1127. Despite this language, it is well-established that "a *consumer* does not have standing under the Lanham Act to sue for false advertising." *Foster v. Wintergreen Real Estate Co.*, 363 Fed Appx. 269, 275 (4th Cir. 2010) (emphasis in original) (citing *Made in the USA Found. v. Phillips Foods, Inc.*, 365 F.3d 278, 281 (4th Cir. 2004)); *see also Dawson*, 2006 Ohio 1240 at ¶ 24 ("At least half of the circuits hold (and none of the others disagree) that § 45 of the Lanham Act . . . specifically 15 U.S.C. § 1127, bars a consumer from suing under the act.").

In reaching the conclusion that consumers lack standing under the Lanham Act, courts acknowledge that the text of the Act "would give standing to parties, such as consumers, having no competitive or commercial interests affected by the conduct at issue." *Conte Bros. Automotive, Inc. v. Quaker State-Slick 50, Inc.*, 165 F.3d 221, 229 (3d Cir. 1998); *P&G v. Amway Corp.*, 242 F.3d 539, 561 (5th Cir. 2001). In other words, the same linguistic issue that Judge Rice pointed out in *Bower* is present in the Lanham Act: the statute on its face contains no limitation on those "natural persons" who may assert a claim. Courts have consistently found, however, that the stated purpose of the Act, which is to protect persons engaged in commerce against unfair competition, "evidences an intent to limit standing to a narrow class of potential plaintiffs possessing interests the protection of which furthers the purposes of the Lanham Act." *Conte Bros.*, 165 F.3d at 229.

Bayer argues that Ohio courts have consistently held that the principles in the ODTPA are to be interpreted in the same way as courts interpret the Lanham Act precisely because those Ohio courts recognize that the ODTPA, like the Lanham Act, was meant to protect only those (including individuals) who are engaged in commerce. Indeed, Bayer points out that if the ODTPA were meant

25

to apply to consumers, it would render the OCSPA superfluous because both prohibit essentially the same conduct.  *Compare* O.R.C. § 4165.02(A) *with* O.R.C. § 1345.02(B).

In response, McKinney points out that, to establish standing in a false advertising claim under the Lanham Act, "the plaintiff must be a competitor of the defendant and allege a competitive injury."  *Praxair, Inc. v. Gen. Insulation Co.*, 611 F.Supp.2d 318, 359 (W.D.N.Y. 2009) (citing *Telecom Int'l Am., Ltd. v. AT&T Corp.*, 280 F.3d 175, 197 (2d Cir. 2001)); *see also Jack Russell Terrier Network v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1037 (9th Cir. 2005) (stating that standing for a false advertising claim under the Lanham Act requires: "(1) a commercial injury based upon a misrepresentation about a product; and (2) that the injury is 'competitive,' or harmful to the plaintiff's ability to compete with the defendant").  Under Ohio law, however, "a complainant need not prove competition between the parties to the civil action."  O.R.C. § 4165.02(B).

McKinney argues that this language marks a critical distinction between the standing requirements under the Lanham Act and the requirements under the ODTPA and counsels against reading them to be co-extensive.  (Doc. 21 at 17.)  Specifically, he argues: "The fact that a DTPA claimant need not prove 'competition' confirms that DTPA's remedies are available not only to competitors, as Bayer has argued, but also to any other person, including injured consumers such as the Plaintiff."  (*Id*.)  In response, Bayer contends that, simply because a plaintiff asserting a claim under the ODTPA need not prove competition does not define who can file suit under the statute.  (Doc. 22 at 16.)  Bayer argues that the ODTPA simply relieves the commercial entities it covers from this requirement.

Typically, when confronted with a still-open question of Ohio law, this Court would apply Ohio law as it believes the highest court in Ohio would if presented with the issue.  In this instance,

however, it is particularly difficult to discern what that high Court would do.  It may well decide to

follow *Dawson*; for all of the reasons Bayer urges, that conclusion would appear wholly justified.

Because the plain language of the statute defines a "person" to include an "individual," however,

and, unlike in connection with a claim under the Lanham Act, a plaintiff need not prove competition

between the parties under the ODTPA, the Court finds that an alternative reading of the act is also

possible.  Accordingly, the Court finds that it is necessary to certify this issue to the Ohio Supreme

Court.  This is particularly true given the split between the Northern and Southern District of Ohio

as to who has standing under the ODTPA and the fact that a number of Ohio Supreme Court Justices

have indicated a belief that the issues raised in *Dawson* should be addressed by that Court.  The

parties are hereby **ORDERED** to submit proposed language for certification within **fourteen (14)**

**days**.  Accordingly, Bayer's Motion to Dismiss Count II is **DENIED** at this time.[8]

### C.      Breach of Express Warranty (Count III)

Count III of the Complaint alleges that Bayer's statements about the health benefits of the

Vitamin Products created an express warranty that the products would actually provide those

benefits.  (Doc. 1 at ¶ 96.)  Bayer seeks dismissal of this claim on grounds that: (1) the challenged

statements do not rise to the level of an express warranty because they are not affirmations of fact;

and (2) McKinney is attempting to obtain damages that are legally unavailable.  To the contrary,

McKinney argues, Bayer promised that the Vitamin Products are "safe" and that they promote

prostate health, "when in fact, the Complaint alleges [they] do no such thing."  (Doc. 21 at 29.)

---

[8]Given the Court's denial of the Motion to Dismiss with respect to McKinney's
individual OCSPA claim and the express warranty claim on behalf of McKinney and the Class,
the Court does not find it necessary to stay proceedings in this case pending a determination on
this issue.  The parties can, if necessary, revisit the propriety of a stay at the upcoming case
management conference with the Court.

McKinney alleges that these statements create an express warranty. (*Id.*)  McKinney further argues that he has adequately alleged economic damages and is entitled, at a minimum, to "benefit-of-the-bargain damages."  (*Id.* at 32).  The Court considers these arguments in turn.

It is undisputed between the parties that this case is governed by the Uniform Commercial Code ("UCC") as adopted by Ohio.  To state a claim for breach of warranty under the UCC, a plaintiff must allege: (1) the existence of a warranty; (2) the product failed to perform as warranted; (3) the plaintiff provided the defendant with reasonable notice of the defect; and (4) the plaintiff suffered an injury as a result of the defect.  *St. Clair*, 581 F.Supp.2d at 902 (citation omitted).[9]

Under Ohio law:

(1)    Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(2)    Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(3)    Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

O.R.C. § 1302.26(A)(1)-(3).  Formal words such as "warrant" or "guarantee" are not necessary to create an express warranty, and the seller need not intend to make a warranty.  O.R.C. § 1302.26(B).

An advertisement can create an express warranty where a statement contained therein fulfills the requirements of O.R.C. § 1302.26(A).  *Nat'l Mulch and Seed, Inc. v. Rexius Forest By-Products, Inc.*, No. 2:02-cv-1288, 2007 U.S. Dist. LEXIS 24904, *50-51 (S.D. Ohio Mar. 22, 2007). That said, "an affirmation merely of the value of the goods or a statement purporting to be merely the seller's

---

[9]Though the parties do not brief it, McKinney alleges, and Bayer does not dispute, that his counsel notified Bayer of the alleged breach of warranty.  (Doc. 1 at ¶ 101.)

opinion or commendation of the goods does not create a warranty."  O.R.C. § 1302.26(B).[10]

Where a seller is aware of the customer's needs, and affirms that the product will meet those needs, that affirmation is sufficient to create an express warranty.  *Bobb Forest Prods., Inc. v. Morbark Indus., Inc*., 783 N.E.2d 560, 574 (Ohio 2002).  In contrast, "puffing," or merely stating the seller's opinion, does not amount to an express warranty.  *Id.* ("For example, statements that a car 'performed fine,' was 'good on gas,' or was a 'good choice' are 'mere sales talk' and, therefore, are merely puffing."); *see also Leal v. Holtvogt*, 702 N.E.2d 1246, 1256 (Ohio Ct. App. 1998) ("[W]hen statements are mere 'puffing,' they cannot constitute an express warranty.").

The existence of an express warranty "depends upon the particular circumstances in which the language is used and read."  *Overstreet v. Norden Labs., Inc*., 669 F.2d 1286, 1290 (6th Cir. 1982) (applying Kentucky law).  Accordingly, courts have held that "[t]he trier of fact must determine whether the circumstances necessary to create an express warranty are present in a given case."  *Id.*; *see also Geir Bros. Farms v. Furst-McNess Co.*, 186 F.Supp.2d 798, 806 (N.D. Ohio 2002) (denying the defendant's motion for summary judgment as to the plaintiff's breach of express warranty claim, "[b]ecause whether the alleged promise of increased production was mere puffing is a question for the jury"); *Royal Bus. Mach., Inc. v. Lorraine Corp*., 633 F.2d 34, 43 (7th Cir. 1980) ("Whether a seller affirmed a fact or made a promise amounting to a warranty is a question of fact

---

[10]It is undisputed that privity is not required with respect to McKinney's breach of express warranty claim.  Ohio courts have indicated that "the absence of privity of contract does not necessarily prevent a person from maintaining an action for breach of express warranty." *Cancino v. Yamaha Motor Corp., U.S.A.*, 2010 U.S. Dist. LEXIS 76645, *33 (S.D. Ohio June 24, 2010); *Bobb Forest Prods., Inc. v. Morbark Indus., Inc*., 783 N.E.2d 560, 574 (Ohio 2002); *Chic Promotion, Inc. v. Middletown Sec. Sys., Inc*., 688 N.E.2d 278, 282 (Ohio 1996) ("Where there is an express warranty, the ultimate consumer may recover even with an absence of direct privity of contract.").

reserved for the trier of fact."); *Kraft Foods N. Am., Inc. v. Banner Eng'g & Sales, Inc.*, 446 F.Supp.2d 551, 570 (E.D. Va. 2006) ("The issue whether a particular affirmation of fact made by the seller constitutes an express warranty is generally a question of fact.").

In *Overstreet*, the Sixth Circuit stated that, "[t]he test is whether the seller assumes to assert a fact of which the buyer is ignorant, or whether he merely states an opinion or expresses a judgment about a thing as to which they may each be expected to have an opinion and exercise a judgment." 669 F.2d at 1290-91 (applying analogous Kentucky law); *see also Nat'l Mulch & Seed*, 2007 U.S. Dist. LEXIS 24904 at *54 (applying Ohio law and stating that the test for "whether a representation is an affirmation of fact that became a part of the basis of the bargain" depends on: "(1) the reasonableness of the buyer in believing the seller, (2) the reliance placed on the seller's statement by the buyer, and (3) whether the seller assumes to assert a fact of which the buyer is ignorant, or whether he merely states an opinion or expresses a judgment about a thing.").  The existence of a warranty, standing alone, is "insufficient to sustain an action for breach of an express warranty." *Overstreet*, 669 F.2d at 1291.  Instead, the warranty must be "part of the basis of the bargain."  *Id.*; *see also* O.R.C. § 1302.26(A)(1)-(3).  A warranty "is the basis of the bargain if it has been relied upon as one of the inducements for purchasing the product."  *Overstreet*, 669 F.2d at 1291.

In the Complaint, McKinney alleges that Bayer's advertisements and labeling of the Vitamin Products created express warranties regarding the health benefits of the products and that those warranties "became part of the basis of the bargain, and are part of a standardized contract between Plaintiff and the members of the Class and Bayer."  (Doc. 1 at ¶¶ 96-97.)  McKinney alleges that Bayer's statements regarding the efficacy and safety of the Vitamin Products for prostate health constitute "affirmations of fact and/or descriptions of the vitamins."  (Doc. 21 at 25.)  Specifically,

30

McKinney argues that "each one of Bayer's statements, as set forth in its advertising and its product label descriptions, was an objective statement regarding the abilities of the product." (*Id.* at 27.)

As previously indicated, the content of the statements at issue is undisputed, and the Court has taken judicial notice of the packaging for the Vitamin Products.[11]  McKinney alleges that he relied upon Bayer's advertised Prostate Claims in making his decision to purchase the products.  As such, McKinney claims, Bayer's statements "became part of the basis of the bargain." (Doc. 21 at 26.); *See Nat'l Mulch & Seed*, 2007 U.S. Dist. LEXIS 24904 at *54 (stating that an affirmation of fact "is part of the basis of the parties' bargain if it induces the buyer to purchase the product").  He further alleges that the Vitamin Products did not conform to the promises made because studies show that selenium does not promote prostate health.

In response, Bayer contends that, when read as a whole, the Prostate Claims amount to conditional statements that the products *might* have certain health benefits, but that they also might not.  While Bayer may be correct, and its arguments have some force, it is not an issue for the Court to decide on a motion to dismiss.  *See Overstreet*, 669 F.2d at 1290 ("The trier of fact must

---

[11]McKinney points to specific language that he claims constitutes an affirmation of fact or description of the product that became part of the "basis of the bargain."  For example, the front of the Men's One-A-Day Health Formula packaging states "Supports prostate health."  There is, however, an asterisk leading the purchaser to a disclaimer on the back of the package that: "This statement has not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure, or prevent any disease." (Doc. 9-1 at 1; Doc. 9-2 at 1.)  The back of the packaging also states that "Selenium may reduce the risk of certain cancers. Some scientific evidence suggests that consumption of Selenium may reduce the risk of certain forms of cancer.  However, FDA has determined that this evidence is limited and not conclusive." (Doc. 9-1 at 1.)  Similarly, on its website and in the television and radio advertisements, Bayer repeatedly indicates that "emerging research suggests" that selenium: (1) "may help reduce the risk of prostate cancer;" or (2) "can help prostate health." (Doc. 1 at ¶¶ 30-31, 33.)  With respect to the One-A-Day Men's 50+ Advantage, the television commercial states that the product has "support for prostate and heart health.  Safe.  That's a great call." (*Id.* at ¶ 32.)

determine whether the circumstances necessary to create an express warranty are present in a given case.").  The totality of the circumstances under which a product is purchased, which may include advertising which is external to the product packaging itself, must be assessed by the trier of fact before the question of whether a warranty exists (or was breached) can be determined.  For these reasons, the Court declines to find that McKinney's express warranty claims fail as a matter of law.

Turning to the issue of damages, in his briefing, McKinney clarifies that he is seeking only economic damages – not damages for any bodily injury.  In the Complaint, McKinney states that he and the class members suffered damages "in the amount of the purchase price [of] the Vitamin Products."  (Doc. 1 at ¶ 100.)

The parties agree that, under the UCC, the measure of damages for breach of warranty is "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount."  O.R.C. § 1302.88(B).  The UCC Official Comments provide that this subsection "describes the usual, standard and reasonable method of ascertaining damages in the case of breach of warranty but it is not intended as an exclusive measure."  *Id*. (UCC § 2-714 Official Cmt. 3).   O.R.C.  §  1302.88(C)  further  states  that,  "[i]n  a  proper  case  any  incidental  and consequential damages . . . may also be recovered."

McKinney argues that, at a minimum, he can "recover the difference in value at the time of purchase/acceptance between vitamins that help prevent prostate cancer and ordinary multiple vitamins."  (Doc. 21 at 24) (stating that "[w]ith proper testimony, presumably from an expert, such damages may be ascertained").  As McKinney correctly notes, moreover, there are instances in which "special circumstances" can lead to recovery of the full purchase price.  *See Eckstein v. Maumee*

*Valley Dodge*, 347 N.E.2d 549, 551 (Ohio Ct. App. 1975).  A determination of whether McKinney could satisfy the "special circumstances" language is inappropriate at this stage.  For purposes of the pending Motion, it is sufficient that McKinney has alleged economic injury, however limited.

At this juncture, the Court must accept the allegations in the Complaint as true and must construe them liberally in favor of McKinney.  McKinney has alleged the necessary elements to state a claim for breach of express warranty.  The Court finds, therefore, that McKinney's allegations are sufficient to make a claim for breach of express warranty plausible.  Accordingly, Bayer's Motion to Dismiss Count III is **DENIED**.

**D.      Breach of Implied Warranty (Count IV)**

Finally, McKinney asserts that Bayer breached the implied warranty of merchantability under O.R.C. § 1302.27 by misrepresenting that the Vitamin Products were safe and fit for ordinary consumption.  (Doc. 1 at ¶ 102.)[12]  Bayer seeks dismissal of this claim on grounds that McKinney has failed to allege facts that would establish privity.[13]

Under Ohio law, privity of contract is generally a prerequisite to a claim for breach of the

---

[12]Under O.R.C. § 1302.27(A), "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."  For goods to be merchantable, they must be, among other things, "fit for the ordinary purposes for which such goods are used" and must "conform to the promises or affirmations of fact made on the container or label if any."  O.R.C. § 1302.27(B)(3), (6).

[13]McKinney's breach of implied warranty claim is based on a contractual theory of implied warranty, rather than a tort-based theory. This distinction is relevant to the issue of privity.  While contract based implied warranty claims require privity of contract between the plaintiff and the defendant, "a plaintiff may be able to recover against a defendant pursuant to [a tort-based theory of implied warranty] despite the lack of privity of contract."  *Bobb Forest*, 783 N.E.2d at 575; *see also Johnson v. Monsanto Co.*, No. 11-02-02, 2002 Ohio 4613, 2002 Ohio App. LEXIS 4740, ¶ 26 (Ohio Ct. App. Sept. 6, 2002) (noting that the right to bring a claim based on implied warranty in tort "does not depend upon the existence of a contractual relationship between the plaintiff and the defendant").

33

implied warranty of merchantability.  *Curl v. Volkswagen of Am., Inc.*, 871 N.E.2d 1141, 1147-48 (Ohio 2007) ("In Ohio, damages are recoverable for breach of implied warranties only if there is privity of contract between the parties."); *Flex Homes, Inc. v. Ritz-Craft Corp. of Mich.*, No. 07cv1005, 2008 U.S. Dist. LEXIS 21339, *25 (N.D. Ohio Mar. 18, 2008) ("Under Ohio law, a consumer cannot sue a remote manufacturer for breach of an implied warranty of merchantability (O.R.C. § 1302.27)"); *Cancino v. Yamaha Motor Corp., U.S.A.*, 2010 U.S. Dist. LEXIS 76645, *29 (S.D. Ohio June 24, 2010) ("In order to prevail on a claim for breach of implied warranty of merchantability or of contract, a plaintiff must establish that he is in privity of contract with the defendant.").

McKinney argues, however, that there is an exception to the privity requirement where the consumer "is the intended beneficiary of the manufacturer's agreement with the retailer/distributor." (Doc. 21 at 31) (citing *Bobb Forest*, 783 N.E.2d at 574).[14]  In *Bobb Forest*, the court noted that a consumer may have privity of contract with a manufacturer if the consumer is "an intended third-party beneficiary to a contract." 783 N.E.2d at 576.  The court further stated that, merely conferring "some benefit on the supposed beneficiary by the performance of a particular promise in a contract [is] insufficient; rather, the performance of that promise must also satisfy a duty owed by the

---

[14]McKinney also cites a 1958 Ohio Supreme Court decision for the proposition that "in the case of foodstuffs, cosmetics or medicines, an implied warranty of fitness for human consumption carries from the manufacturer to the ultimate consumer."  (Doc. 21 at 31) (citing *Rogers v. Toni Home Permanent Co.*, 147 N.E.2d 612, 614 (Ohio 1958)).  As Bayer correctly notes, McKinney's reliance on *Rogers* is misplaced because it involved a claim for breach of express warranty.  While the court held that an "ultimate consumer may maintain an action for damages immediately against the manufacturer on the basis of express warranty, notwithstanding that there is no direct contractual relationship between them," the court did not address any privity exception with respect to implied warranties.  *Id*. at syllabus no. 3.

34

promise to the beneficiary." *Id.* (internal quotations and citations omitted).[15]

Bayer argues that McKinney's reliance on *Bobb Forest* is misplaced because, although that court concluded that a privity exception might be applicable in certain specific circumstances, the Ohio Supreme Court subsequently held that vertical privity is required for implied warranty claims under O.R.C. § 1302.27.  (Doc. 22 at 20) (citing *Curl*, 871 N.E.2d at 1147).  The Court agrees.

In *Curl*, the Ohio Supreme Court indicated that:

> A claim for breach of implied warranty, though similar to a tort action, arises pursuant to the law of sales codified in Ohio's Uniform Commercial Code.  The privity requirement, which remains absent in strict liability tort actions, allows sellers of goods to define their scope of responsibility and provides a greater degree of foreseeability regarding potential claimants.  To permit a claimant to recover without establishing vertical privity blurs the distinction between contract and tort.

871 N.E.2d at 1147 (internal citations omitted).  Given this unequivocal language, the Court declines to extend the limited privity exception articulated in *Bobb Forest* beyond the facts of that case.

Because there are no allegations that McKinney was in privity of contract with Bayer, he cannot maintain a claim for breach of the implied warranty of merchantability.   Accordingly, Count IV is **DISMISSED**.

---

[15]In *Bobb Forest*, the court found that the plaintiff was the intended beneficiary of the sales contract because: (1) the defendant knew it was manufacturing the sawmill for the plaintiff's use; (2) the defendant "did not mass produce sawmills" and it "had only manufactured approximately one sawmill a year since the early 1990s;" and (3) the defendant "knew exactly whom the ultimate consumer of this sawmill would be" and what the plaintiff's "needs and requirements were." 783 N.E.2d at 576.  The court concluded that, because the defendant "produced this specific sawmill for this specific consumer while knowing this specific consumer's needs," the parties were in privity of contract such that the plaintiff "would be able to recover against [the defendant] under a theory of implied warranty in contract."  *Id*.  In other words, the court's application of the privity exception was highly fact-specific.

E.    **Bayer's Motion to Dismiss McKinney's Individual OCSPA Claim Under Rule 12(b)(1) is Denied.**

Bayer argues that the Court should dismiss McKinney's individual OSCPA claim under Rule 12(b)(1). Specifically, Bayer argues that, once the Court dismisses the OCSPA class claim and McKinney's other claims in the Complaint, the Court will lack subject matter jurisdiction over his individual claim. (Doc. 7 at 15.) (citing *St. Clair*, 581 F.Supp.2d at 901-902). Bayer has not presented any other arguments as to why McKinney's individual OCSPA claim should not proceed.

Given the Court's denial of the Motion to Dismiss with respect to McKinney's ODTPA claim and express warranty claims on behalf of McKinney and the Class, the Court finds that it continues to have supplemental subject matter jurisdiction over McKinney's individual OCSPA claim. Accordingly, Bayer's Motion to Dismiss McKinney's individual OCSPA claim under Rule 12(b)(1) is **DENIED**.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiff's Complaint (Doc. 6) is **GRANTED in part** and **DENIED in part**. Specifically, Bayer's Motion is **GRANTED** as to the OCSPA class claim in Count I and as to Count IV. The Motion is **DENIED** as to Counts II, III, and as to McKinney's individual claim under the OCSPA. With respect to the ODTPA claim, the Court will certify to the Ohio Supreme Court the question of whether a consumer has standing to file suit under the statute. The parties shall have **fourteen (14) days** from the date of this Order to submit proposed language for certification.

IT IS SO ORDERED.                              s/Kathleen M. O'Malley
                                               **KATHLEEN McDONALD O'MALLEY**
                                               **UNITED STATES DISTRICT JUDGE**


Dated: September 30, 2010

36